IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| STEVE RIDDICK, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:20cv00448 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| LT. J. LAMBERT, *et al.*, | ) | By:  Hon. Thomas T. Cullen |
| | ) |       United States District Judge |
| Defendants. | ) | |

Steve Riddick, an inmate in the custody of the Virginia Department of Corrections ("VDOC") proceeding *po se*, filed this civil rights complaint under 42 U.S.C. § 1983.[1] He previously sought to dismiss some of his claims, which the court granted. (Order, Dec. 6, 2021 [ECF No. 47].) Riddick's complaint does not list claims separately, and it is not entirely clear what his claims are. The court construes his complaint as asserting the following remaining claims, apparently against all defendants: (1) the defendants caused Riddick to be housed in a cell with water/plumbing issues from May 8, 2019 through June 18, 2019, in violation of the Eighth and Fourteenth Amendments; (2) the defendants retaliated against Riddick, in violation of his First and Fourteenth Amendment rights, by housing him in that cell after another inmate's girlfriend reported to the Virginia State Police that her boyfriend, Riddick, and other inmates had been attacked; and (3) the defendants' actions constituted willful and wanton

---

[1] Riddick's original, 15-page complaint is docketed at ECF No. 1. He subsequently filed a five-page document, docketed as an "Amended Complaint," which contained a list of defendants and explained his claims against defendants Adams and Bivens. (ECF No. 5.) The court considers both documents as setting forth his claims.

negligence under Virginia law. (ECF Nos. 1, 5.)[2]

This matter is now before the court on a motion to dismiss filed by Defendants Gary Adams and Robert Bivens, whose sole involvement in the alleged events was to respond to Riddick's grievances concerning some of the allegations in his complaint. (ECF No. 36.) They contend that Riddick's complaint fails to state a claim against them.

Within the time for responding to the motion to dismiss, Riddick filed a two-page document that he styled as a "motion for summary judgment" that contains a summary of his claims under penalty of perjury. (ECF No. 41.) It also includes a Declaration from inmate Martin (ECF No. 41-1), which is merely another copy of the "Declaration" Martin previously submitted in support of Riddick's complaint (ECF No. 16). Notably, the document does not address any of the arguments raised in the motion to dismiss. Arguably, then, the motion to dismiss in unopposed.

The remaining four Defendants—Unit Manager Collins, Sergeant Taylor, Sergeant Eldridge, and Lieutenant Lambert—have filed a motion for summary judgment seeking judgment in their favor as to all remaining claims. (ECF No. 47.) All three motions were fully briefed and are ripe for disposition. For the reasons explained below, the court will grant the motion to dismiss, grant defendants' motion for summary judgment, and deny Riddick's motion for summary judgment.

## I.

The court will first address the motion to dismiss before turning to the factual predicate for the summary judgment motion. Riddick alleges that on May 8, 2019, he was moved into a

---

[2] Riddick's complaint references the Fourth Amendment at one point (Compl. 9), but none of his allegations state a viable Fourth Amendment claim.

cell that he claims had water leaking from its vent. He was transferred from that cell to a new cell on June 18, 2019. A week before that cell transfer, he filed an informal complaint in which he stated that water had been running out the bottom vent onto the floor since May 8, 2019. (*See* Aff. of C. Meade ¶ 8 & Encl. B, Dec. 14, 2021 [ECF No. 50-1].)

On July 8, 2019, the grievance office received a regular grievance from Riddick, which Riddick had dated June 27, 2019. (*See* Meade Aff. ¶ 9 & Encl. C.) In it, he complained about water in his cell from May 8, 2019 through June 18, 2019. That grievance was rejected by defendant Adams as untimely because it was not filed within 30 days of the issue being grieved, which was treated as May 8, 2019. The complaint alleges that Adams "unfairly rejected" the grievance for having an "expired filing date." (Compl. 2, ECF No. 5.) Defendant Bivens upheld the intake decision on appeal. (*Id.* at 2–3.)

As noted, Riddick has not filed a response in opposition to the motion to dismiss, even though he was warned that a failure to respond could be taken by the court as indicating that he did not oppose the relief sought in that motion. (ECF No. 38.) Nonetheless, the court will address its merits briefly.

Defendants Adams and Bivens seek dismissal of the claims against them on two distinct grounds. First, they note that their only involvement was in responding to grievances after Riddick was removed from the allegedly leaky cell. As such, they contend that their actions did not constitute a constitutional violation. Second, because Riddick sues them only in their official capacities—unlike the other four defendants—and seeks only monetary damages against them, the claims must be dismissed because they are entitled to Eleventh Amendment immunity.

Adams and Bivens are correct on both grounds. First, it is well-established that state

employees are immune from claims for damages brought against them in their official capacities. State employees acting in their official capacities are not "persons" for purposes of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). In addition, the Eleventh Amendment, which immunizes the states against suits for money damages brought in federal court, *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013), applies with equal force to suits brought against state employees in their official capacities, *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996); *see also Will*, 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (citation omitted)). Accordingly, the court will grant the motion to dismiss filed by defendants Adams and Bivens and will dismiss them from this lawsuit.

As to the second ground—and even if Riddick's complaint had contained claims against these defendants in their individual capacities—he has failed to state a claim against them. "[I]t is well established that a response to a grievance (or failure to respond to a grievance), without more, does not give rise to a constitutional claim." *Johnson v. Clarke*, No. 7:20cv717, 2021 WL 1536585, at *2 (W.D. Va. Apr. 19, 2021); *see also Crawley v. Parsons*, No. 7:15-CV-00647, 2017 WL 2983899, at *6 (W.D. Va. July 12, 2017) (finding that "to the extent that plaintiff's claim against [prison officials] relies on their responses to his after-the-fact grievances, it is unavailing. Plaintiff has no constitutional right to participate in grievance proceedings."); *Brown v. Va. Dep't of Corr.*, No. 6:07cv33, 2009 WL 87459, at *13 (W.D. Va. Jan. 9, 2009) ("[T]here is no liability under § 1983 for a prison administrator's response to a grievance or appeal."). "Only persons who cause or participate in the violations are responsible. Ruling against a prisoner on an administrative complaint does not cause or

contribute to the violation." *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) (internal citations omitted); *see also Gupton v. Wright*, No. 7:15cv214, 2016 WL 524656, at *3 (W.D. Va. Feb. 8, 2016) (opining that § 1983 claims "concern[ing] nothing more than the responses" individual defendants "made to [the plaintiff's] grievances and appeals . . . do not implicate any constitutionally protected right").

Defendants' conduct is paradigmatic of these important principles. Adams's review of Riddick's grievance merely determined that he did not properly comply with the timing rules of VDOC's grievance procedure, and defendant Bivens's involvement was limited to deciding whether the rejection of the grievance at intake was consistent with proper application of the policies. For these reasons, the motion to dismiss must be granted.

## II.

Turning to the remaining defendants' motion for summary judgment, the court has considered the two affidavits by Unit Manager Collins and non-defendant Meade submitted by the defendants. Evidence in the summary judgment record also includes Riddick's opposition, which he has signed under penalty of perjury (ECF No. 53 at 9), his own motion for summary judgment, also signed under penalty of perjury (ECF No. 41 at 3), and additional evidence he has submitted—including the declaration of inmate Martin—and additional documents in support of his claim (ECF Nos. 16, 41-1, 52). Riddick's complaint and amended complaint, however, are unverified. Thus, the facts in them will not be considered as summary judgment evidence. *See Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (explaining that a *pro se* prisoner's *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes when the allegations are based on personal knowledge, but an unverified complaint is not).

At all times pertinent to his claims, Riddick was confined at Red Onion State Prison ("Red Onion") in Wise County, Virginia. On May 7, 2019, another inmate, Martin, used an inmate telephone to call his girlfriend, who then "3-wayed the Virginia State Police, so [he] could report excessive force by an officer Z. Mannon on 4 different occasions, on 4 separate inmates in long term segregation, including [Riddick]." (Decl. of Sidney Patrick Martin ¶ 2, Jan. 2, 2020 [ECF No. 16].) Martin avers that, on May 8, he was escorted to a meeting in the Warden's office during which he was asked why he was calling the VSP and the Warden made racist remarks and told Martin to "worry about [him]self." (Id. ¶ 3.) Martin later talked to an investigator and special agent to convey what had occurred with Mannon. On the same day, Martin claims he was threatened by Defendant Lambert, and he had to attend another meeting with Defendant Collins, who used a racist slur and called Martin "trash."[3] (Id. ¶ 6.) Collins does not recall such a meeting, but he was aware that Martin had written a letter to VDOC headquarters and complained to the State Police. He states, however, that "these occurrences had nothing to do with Riddick." (Aff. of Larry Collins ¶ 4, Dec. 16, 2021 [ECF No. 50-2].) According to Martin, he was complaining about another Red Onion officer—Correctional Officer Mannon, who is not a party to this action—who allegedly assaulted him and several other inmates, including Riddick.[4]

On the same date, Riddick was moved from cell C-305 in Unit C-3 to cell C-201 in

---

[3] Collins does not recall being present at any such meeting and disputes other aspects of Martin's version of events. (Aff. of Larry Collins ¶ 5, Dec. 16, 2021 [ECF No. 50-2].) For purposes of summary judgment, though, the court will credit Martin's sworn testimony as to the meeting.

[4] Martin's affidavit also contains additional statements about Riddick, but they are legal conclusions, conclusory allegations, or they are not based on personal knowledge. These include that Riddick has been "retaliated on" and "treated as if he isn't a human," and that Riddick was "forced to live under these conditions and constantly harassed over exercising his right to report a crime or seek assistance." (Martin Decl. ¶ 12.)

Unit C-2. Based on Unit Manager Collins's review of housing records, Riddick was moved based on a "staff request," but Collins does not recall which staff member made the request or why Riddick was moved. Collins's affidavit cites numerous legitimate reasons why an offender may be moved to a different cell in the same or a nearby unit. And as Collins correctly points out, no due process hearing is required before moving an inmate to a similar cell in the same building. (Collins Aff. ¶ 4.)

Riddick claims that cell C-201 had water coming out of the cell vent. (Compl. 4–8; Pl.'s Mot. Summ. J. 2 [ECF No. 41].) Specifically, he contends that every time the toilet in either of the cells above him was flushed, water would come through his bottom vent. (Pl.'s Mot. Summ. J. 1–2.) As a result, he had to "wipe up dirty infested water numerous times a day for 42 days." (*Id.* at 2.)

Riddick contends that defendant Taylor saw the water on his cell floor when Taylor moved him into the cell, and Riddick states that he notified building sergeants, an unnamed supervisor, and defendants Collins and Lambert about the water on multiple occasions, but he was not moved to a different cell. He further alleges that he was not given gloves so he could properly clean the cell. According to Riddick's unverified complaint, the condition of his cell caused him emotional and physical harm, headaches, skin irritation, depression, anxiety, and agitation. (Compl. 13.) Riddick does not state that he ever sought medical treatment for any of these symptoms allegedly caused by his cell's condition. Riddick remained housed in cell C-201 through June 18, 2019, at which point he was moved to cell C-203 in the same unit.

Collins sets forth a number of facts—most undisputed by Riddick—concerning inspections by officers and sanitizations of cells by inmate workers before a new inmate moves

in, the provision of gloves and cleaning supplies, and the frequency of rounds and cell inspections, including visual inspections required any time an offender leaves the cell for any reason. Collins also states in his affidavit that he was not aware of any complaints from Riddick about the cell being dirty and that he "has no reason to believe that Riddick had a leak in his cell." (Collins Aff. ¶ 7.) Taken collectively, these facts make it highly unlikely that there was, in fact, any significant water in Riddick's cell that entire period that either went unnoticed or that numerous officers purposefully failed to note or to get fixed. But the court must credit Riddick's testimony for purposes of summary judgment, which is that his cell had water leaking from its vent multiple times a day, that he reported this fact to defendants and others, and that the problem was not remedied before he was moved to a different cell.[5]

Riddick's complaint acknowledges that maintenance staff made at least one attempt to fix the leak. After he initially reported it to maintenance, someone from that department responded to his cell approximately two weeks later. They checked the pipes, had him flush his toilet, and told him they saw the water; but, apparently, they did not fix the problems to Riddick's satisfaction. Instead, the issues persisted until June 18, 2019, when Riddick showed Warden Kiser water in his cell and was subsequently moved. In total, Riddick spent 42 days in cell C-201. (Compl. at 8.)

Riddick states that he attempted to grieve the incident but was unable to obtain an informal complaint to do so. For support, he submits a document dated May 10, 2019, in which he states that he needs an "inf."—a reference to an informal complaint form—"to

---

[5] Riddick offers inmate Martin's testimony in support of his claims, but that testimony could not have been based on personal knowledge as Martin was housed in a different housing unit at the time and could not see Riddick's cell during the relevant time period. (Collins Aff. ¶ 6.)

address the water issue in my cell & I haven't been able to get one." (ECF No. 52, at 2.) He asserts that he had to wait approximately one month to obtain an informal complaint form.[6]

Apparently, he requested that maintenance come to the cell a second time by submitting an Offender Request form, dated June 10, 2019, which stated that water was coming out of the cell vent. That form was stamped as received on June 17, and responded to on June 21, with a note that a "work order was created 6-21-19." (ECF No. 52, at 3.) At that point, though, Riddick had been moved to a different cell.

Riddick filed an informal complaint a week before he was moved out of cell C-201 and a grievance afterward. The grievance was rejected at intake, and that decision was upheld on appeal.

### III.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49(1986)).

---

[6] The May 10 document does not indicate it was actually received by anyone at Red Onion. To the extent that Riddick is claiming the grievance process is unavailable to him, that is refuted by the fact that, in the two-year period from January 2018 through December 31, 2019, Riddick had approximately 26 regular grievances and 122 informal complaints accepted and processed. (Meade Aff. ¶ 10.) This strongly refutes any assertion that the grievance procedure was unavailable to him. *See Moss v. Harwood*, 19 F.4th 614, 622–23 (4th Cir. 2021) (explaining that generally, where an inmate is able to file multiple grievances during the relevant time period, it undercuts any claim that the grievance system was unavailable). Regardless, the court is not deciding this case on exhaustion grounds.

When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. *Anderson*, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the nonmoving party's case." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (cleaned up).

## IV.

### A.

The court will first address Riddick's Eighth Amendment claim regarding the condition of the cell. Defendants argue that this claim fails because Riddick did not properly exhaust his administrative remedies concerning this allegation. They also contend that the facts, as he has stated them, do not establish an Eighth Amendment violation. Because the court concludes that Riddick's allegations fail to state a viable Eighth Amendment claim, it need not address the issue of exhaustion.

The Eighth Amendment protects prisoners from cruel and unusual living conditions. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). But "the Constitution does not mandate comfortable prisons," and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347–49. To plead such a claim, a prisoner must set forth facts showing that: (1) objectively, the deprivation was sufficiently serious, in that the challenged, official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)

(citations omitted).

To determine if a deprivation is sufficiently serious as to satisfy the first prong, a court must evaluate the conditions in light of contemporary standards of decency, keeping in mind that the Eighth Amendment "does not mandate comfortable prisons," but only prohibits "extreme deprivations." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). To demonstrate that the conditions are "extreme enough to satisfy the objective component of an Eighth Amendment claim, a prisoner must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions" or "demonstrate a substantial risk of such serious harm." *Id.* To satisfy the second, the prisoner must show that a correctional officer was actually aware of a serious risk of significant harm to the prisoner and disregarded it. *Id.* This is an "exacting standard." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

Applying these well-established principles, numerous courts, including the Fourth Circuit, have held that similar—and arguably worse—conditions than those alleged by Riddick do not violate the Eighth Amendment. *See, e.g., Shrader v. White*, 761 F.2d 975, 984 (4th Cir. 1985) (finding no Eighth Amendment violation where the ceilings sometimes leaked, there was cold water in cells, the shower heads dripped, and the shower area had mold and mildew); *Pickett v. Winston*, No. 7:20-CV-00114, 2020 WL 2814180, at *2 (W.D. Va. May 29, 2020) (dismissing Eighth Amendment claim where plaintiff alleged facility had mold in the ceiling, ventilation, and shower, and that the ceiling leaked); *Malone v. Francis*, No. CV 5:19-00146, 2019 WL 3026801, at *5 (S.D.W. Va. June 14, 2019) (dismissing Eighth Amendment claim based on a leaking window, the presence of black mold, and the lack of cold water), *report and recommendation adopted*, No. 5:19-CV-00146, 2019 WL 3021804 (S.D.W. Va. July 10, 2019); *Parker v. Neely*, No. 3:08CV224-03-MU, 2008 WL 2115167, at *2 (W.D.N.C. May 19, 2008)

(finding plaintiff's complaints about a frequently-broken hot water heater, leaking roof, old windows, smelly sewer system, and exposed wire ends and nuts inside of drop ceilings did not state a significant deprivation under the Eighth Amendment); *Mase v. Henry Cnty. Jail*, No. CIV.A. 7:06CV00627, 2006 WL 3091046, at *1 (W.D. Va. Oct. 27, 2006) (dismissing plaintiff's complaint where he alleged that mildew or mold was growing in the showers and "people" were "getting rashes," even assuming he were one of those people); *Oliver v. Powell*, 250 F. Supp. 2d 593, 604 (E.D. Va. 2002) (finding prisoner failed to state an Eighth Amendment claim where he alleged that cell contained roaches, leaky toilets, and peeling paint). *See also Whitmore v. W. Reg'l Jail*, No. 3:18-CV-01483, 2019 WL 3756396, at *8 (S.D.W. Va. July 19, 2019) (collecting and discussing many cases where courts found that similar or worse conditions than those alleged here did not create a deprivation that was "sufficiently serious" to meet the objective component of an Eighth Amendment claim), *report and recommendation adopted*, No. 3:18-CV-1483, 2019 WL 3759806 (S.D.W. Va. Aug. 7, 2019); *Riddick v. Kiser*, No. 7:20cv00096, 2021 WL 4453667, at *8 (W.D. Va. Sept. 29, 2021) (finding no Eighth Amendment violation where the plaintiff complained about lack of running water for a period of time, "a dirty toilet bowl, dirty walls, and chipped paint on the floor").

Like the many courts cited above, this court concludes that the alleged conditions of Riddick's cell—where he was housed for only 42 days—fail to rise to the level of a constitutional deprivation actionable under § 1983. Notably, although he states that the water was "dirty" and "infested," (Pl.'s Mot. Summ. J. 2), he does not allege that there was an unsanitary substance in his cell, only that he "could have" been. (Compl. 11.) Moreover, although he states that he suffered physical symptoms in the form of headaches and skin irritation, as well as emotional harms (such as depression, anxiety and agitation), defendants

noted in their motion that he did not make any prison official aware of these medical issues or report them to medical staff, a fact he does not dispute. Nor is it clear that these alleged symptoms are sufficient to support an Eighth Amendment claim. *See Beverati v. Smith*, 120 F.3d 500, 504 n. 5 (reasoning that despite plaintiffs' being housed for six months in "unbearably hot" cells that were infested with vermin, smeared with human feces and urine, and flooded with water from a leak in the toilet on the floor above, they failed to state an Eighth Amendment claim where "they made no showing that the conditions resulted in serious physical or emotional injuries or the grave risk of such harm").

The court further notes that, by Riddick's own admission, a work order was submitted for the leak in his cell, and the maintenance department came, albeit not promptly, to examine and attempt to fix the leak, but they were unsuccessful. Another work order was created in response to his later request, although at that point he had been moved. This further undermines any assertion that the defendants had exhibited deliberate indifference by placing him—or leaving him—in that particular cell. Even if the Defendants or the maintenance employees were negligent in repairing the leak, that does not rise to the level of deliberate indifference. *Farmer*, 511 U.S. at 835 ("[D]eliberate indifference entails something more than mere negligence . . . ."). For all of these reasons, the court concludes that defendants are entitled to summary judgment as to the Eighth Amendment claim.

## B.

Riddick also states that he is bringing a "due process" claim under the Fourteenth Amendment. (Compl. 9.) The Due Process Clause of the Fourteenth Amendment encompasses three types of claims enforceable under § 1983: (1) claims for violations of rights enshrined in the Bill of Rights and incorporated against the states; (2) claims under the

substantive component of the Due Process Clause, which "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them'"; and (3) claims under the procedural component of the Due Process clause, which contains a guarantee of fair procedure. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

To the extent Riddick's claim could be construed as a procedural due process claim, it fails. There is no liberty or property interest in being housed in a particular cell within the same type of housing unit. *Pevia v. Hogan*, 443 F. Supp. 3d 612, 634 (D. Md. 2020) (collecting authority for the proposition that a prisoner does not have a constitutional right "to be housed in a particular institution, at a particular custody level, or in a particular portion or unit of a correctional institution"). And even under VDOC procedure, there is no right to a due process hearing before being transferred to a different cell in the same type of unit, which is what occurred when Riddick was moved on May 8, 2019. (Collins Aff. ¶ 4.) If his claim is based on the denial of his grievances by Adams and Bivens, it fails for the reasons discussed in Section I above.

To the extent Riddick is attempting to assert a substantive due process claim, his attempt fails based on *Graham v. Connor*, 490 U.S. 386 (1989). In *Graham*, the Supreme Court held that where an explicit textual source of constitutional protection applies to government conduct, "that Amendment, not the more generalized notion of 'substantive due process,'" must be the guidepost for analyzing the claim. 490 U.S. at 395.

Under *Graham*, the Court will not engage in a separate substantive due process analysis, but instead has analyzed Riddick's allegations under the Eighth Amendment, where they fit comfortably. *See Harper v. C.O. Joseph Barbagallo*, No. 2:14-CV-07529, 2016 WL 5419442, at *10

(S.D.W. Va. Sept. 27, 2016); *Love v. Salinas*, No. 2:11-cv-00361-MCE-CKD, 2013 WL 4012748, at *7 n. 5 (E.D. Cal. Aug. 6, 2013) ("Because Plaintiff's 'failure to protect' claim is based on the Eighth Amendment, no separate discussion of Plaintiff's substantive due process claim . . . is necessary."); *Brothers v. Lawrence Cnty. Prison Bd.*, No. 06-1285, 2008 WL 146828, at *12 (W.D. Pa. Jan. 14, 2008) (finding an inmate did not state a cause of action for substantive due process where alternative constitutional amendments covered the conduct giving rise to his alleged violations). Riddick's separate Fourteenth Amendment claim must be dismissed.

## C.

Defendants are also entitled to summary judgment on Riddick's retaliation claim. To succeed on his retaliation claim, Riddick must establish that "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (citing *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017)) (alterations omitted). Notably, however, the Fourth Circuit has cautioned that courts must treat an inmate's claim of retaliation by prison officials "with skepticism." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996). Thus, conclusory allegations of retaliation are insufficient to survive dismissal. *Adams v. Rice*, 40 F.3d 72, 74–75 (4th Cir. 1994) (summarily dismissing retaliation claim as insufficient because it consisted merely of conclusory allegations and no facts to show retaliatory motivation).

The court agrees with defendants that Riddick has failed to put forth facts from which a reasonable jury could conclude that he engaged in protected activity. His theory of his retaliation claim is that he was placed in a cell with water leaking from its vent and purposefully kept there for 42 days because another inmate's girlfriend (in conjunction with that inmate)

complained about assaults on several prisoners, including Riddick. That is not protected activity *by Riddick*, however, and so his claim fails because he cannot establish the first element of his claim.

Riddick also has failed to set forth any evidence that would persuade a reasonable factfinder of the third element—causation. Other than his own speculation, there is simply nothing in the record to suggest that he was placed in that cell by one or more of the defendants purposefully—and with any knowledge that the cell had leaky pipes—to retaliate for Martin's complaint. Indeed, Riddick himself suggests another reason for his and Martin being moved to different cells that day—to keep him and Martin separated. (Pl.'s Opp'n to Defs.' Mot. Summ. J. 3 ("Staff felt we—Martin, Johns, [another of the inmates Martin alleged had been assaulted by Mannon], and I needed to be separated.").) If so, then the motivation was not retaliatory.

Furthermore, he also does not know, and the record does not reveal, who made the decision to place him in cell C-201 and whether that particular person even knew about Martin's protected conduct. Collins—who admits he knew Martin had made a report to the VSP but did not believe that had anything to do with Riddick—has submitted testimony denying that he made the decision to move Riddick. Without any evidence of who made the decision to move him, Riddick cannot simply point to every officer who knew of Martin's report and then suggest that "they" moved Riddick to retaliate. That is simply insufficient to impose § 1983 liability on any of them. *See McLin v. Dep't of Corr.*, No. 7:19cv00247, 2020 WL 448260, at *2 (W.D. Va. Jan. 28, 2020) (collecting authority for the proposition that a § 1983 plaintiff may not simply make allegations against defendants as a group, but must allege and ultimately establish each individual defendant's liability for the alleged misconduct); *cf. Trulock*

*v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (explaining that liability under § 1983 is "personal, based upon each defendant's own constitutional violations").

For all of the foregoing reasons, defendants are entitled to summary judgment as to Riddick's retaliation claim.

### D.

Riddick's complaint also asserts a claim of willful and wanton negligence under Virginia law based on the same factual circumstances. (Compl. 15.) Because all of plaintiff's federal claims are being dismissed, the court will decline to exercise jurisdiction over any state-law claims. 28 U.S.C. § 1367(c)(3).

### V.

As noted, Riddick has styled a filing submitted after the motion to dismiss as a motion for summary judgment. Not only is the motion deficient in failing to identify undisputed facts, but such a motion would require the court to view the evidence in the light most favorable to defendants. So viewed, Riddick's motion must be denied for the same reasons that defendants' summary judgment motion must be granted: Riddick has not presented facts from which a reasonable factfinder could conclude that Defendants violated his constitutional rights.

### VI.

For the reasons set forth above, the court will grant defendants' motions to dismiss and for summary judgment and will deny Riddick's motion for summary judgment.

The Clerk is directed to send a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 2nd day of March, 2023.

>  /s/ Thomas T. Cullen
>  HON. THOMAS T. CULLEN
>  UNITED STATES DISTRICT JUDGE